Filed 4/14/17

# CERTIFIED FOR PARTIAL PUBLICATION*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE RODRIGUEZ PAZ,<br><br>    Defendant and Appellant. | B265251<br><br>Los Angeles County<br>Super. Ct. No. LA076450 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael V. Jesic, Judge.  Affirmed as modified.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, and Roberta L. Davis, Deputy Attorney General, for Plaintiff and Respondent.

---

\*    Pursuant to California Rules of Court, rules 8.1100, 8.1105(b), and 8.1110, this opinion is certified for publication with the exception of parts 2, 3, 4, and 5 of the Discussion.

# INTRODUCTION

Defendant Jose Rodriguez Paz was convicted of aggravated kidnapping, forcible rape, forcible sodomy, and related deadly-weapon and one-strike allegations after abducting H. Ramirez at knifepoint and assaulting her in an isolated parking lot.[1]  On appeal, he contends: (1) there is insufficient evidence to support the sexual penetration element of sodomy; (2) trial counsel provided constitutionally deficient representation by failing to object to brief testimony about surveillance footage, failing to request an instruction about how to evaluate that testimony, and failing to object to the term *rape kit*; (3) the court had a sua sponte obligation to instruct the jury to abide by the interpreter's translation; (4) defendant's consecutive one-strike sentences are unauthorized because no reasonable trier of fact could have concluded he had a sufficient opportunity to reflect during the attack; and (5) he must be resentenced because the court failed to state its reasons for imposing upper terms for two enhancements.

In the published portion of this opinion, we hold that the sexual penetration element of sodomy requires penetration past the buttocks and into the perianal area, but does not require penetration beyond the perianal folds or anal margin.  We conclude the evidence before us is sufficient to establish that element.  In the unpublished portion of the opinion, we reject

---

[1]     Because the victim in this case has an unusual first name and a common last name, we refer to her by surname only.  (See Cal. Rules of Court, rule 8.90(b)(4) [nondisclosure of identity]; U.S. Census Bur., Frequently Occurring Surnames from the 2010 Census (Dec. 2016) file A.  <https://www.census.gov/topics/population/genealogy/data/2010_surnames.html> [as of April 5, 2017] [Ramirez is 28th most common surname in the United States].)

defendant's remaining arguments, modify the judgment to clarify the statutory basis for defendant's sentence, and affirm as modified.

## PROCEDURAL BACKGROUND

By amended information filed April 20, 2015, defendant was charged with aggravated kidnapping (Pen. Code, § 209, subd. (b)(1); count 2);[2] kidnapping (§ 207, subd. (a); count 3); forcible rape (§ 261, subd. (a)(2); count 4); and sodomy by force (§ 286, subd. (c)(2)(A); count 5).[3]  As to counts 2 and 3, the information alleged that defendant personally used a knife (§ 12022, subd. (b)(1)).  As to counts 4 and 5, the information alleged that defendant used a deadly weapon in the commission of a sex offense (§ 12022.3, subd. (a)); was armed with a deadly weapon in the commission of a sex offense (§ 12022.3, subd. (b)); kidnapped the victim within the meaning of the One Strike Law (§ 667.61, subd. (a), (d)(2) [movement substantially increased risk of harm], (e)(1) [simple kidnap]); and used a deadly weapon within the meaning of the One Strike Law (§ 667.61, subds. (a), (e)(3)).  The information also alleged two prison priors (§ 667.5, subd. (b)).  Defendant pled not guilty and denied the allegations.

After a bifurcated trial at which the victim testified with the assistance of a Spanish-language interpreter and defendant did not testify, the jury found defendant guilty of all counts and

---

[2]     All undesignated statutory references are to the Penal Code.

[3]     The original information, filed December 1, 2014, also charged defendant with attempted carjacking (§ 664/215, subd. (a); count 1) and alleged that he personally used a firearm in the commission of the offense (§ 12022.53, subd. (b)).  That charge and enhancement were dismissed on December 30, 2014.

found the allegations true. Defendant admitted the prior convictions.

After a contested hearing, the court sentenced defendant to 70 years to life. The court selected count 4 (§ 261, subd. (a)(2); rape) as the base term and sentenced defendant to 35 years to life—a one-strike term of 25 years to life (§ 667.61, subds. (a), (d)) plus the high term of ten years for the deadly-weapon enhancement (§ 12022.3, subd. (a) [personal use]). The court imposed an identical sentence for count 5 (§ 286, subd. (c)(2)(A)), to run consecutively. The court stayed count 2 (§ 209, subd. (b)(1)) and its related enhancement under section 654 and dismissed count 3 (§ 207, subd. (a)) because it was a lesser-included offense of count 2. The court struck the prison priors (§ 667.5, subd. (b)).

Defendant filed a timely notice of appeal.

## FACTUAL BACKGROUND

On August 16, 2012, sometime before sunrise, Ramirez left her home in Van Nuys and walked toward her bus stop on Van Nuys Boulevard. Suddenly, a man later identified as defendant grabbed her from behind and put her in a chokehold. He told her to walk. Ramirez struggled but was unable to get free. Defendant pushed her across the street; he remained behind her, with his arm around her neck. As Ramirez continued to struggle, defendant grabbed her hand and placed it on a knife he held to her back; he said he would stab her if she stopped walking. Defendant took Ramirez several blocks away to an alley adjacent to an apartment building on Victory Boulevard. They walked down the alley to a parking area in back. The parking area—essentially a large carport—was deserted.

4

Defendant directed Ramirez to the back corner between a wall and a parked car.  He told her to undress.  When she refused, defendant removed her pants and underwear.  He repeatedly told Ramirez to lie down, but she refused.  Defendant, who was standing behind her, touched "behind" Ramirez with his penis and "started having anal sex with [her]."  The act caused her pain.  She told defendant he was hurting her, but he did not stop.  At some point, defendant pushed Ramirez to the ground and penetrated her vagina with his penis.

When Ramirez saw headlights from a car driving by, she told defendant the police were on their way.  He stopped the assault and said, "Tell him I'm your boyfriend."  Ramirez agreed.  Then she got dressed and walked back to the street.  Defendant caught up with Ramirez and demanded her phone, but she refused.  She told defendant to leave, then crossed the street and tried to get help from a passerby.  When the woman ignored her, Ramirez called her sister, who drove her to the police station.

At around 9:00 a.m., officers drove Ramirez in a police car as she directed them to the site of her abduction, along the path defendant forced her to walk, and to the parking lot where the attack occurred.  Ramirez showed the officers the exact location of the assaults, and the officers secured the scene and dusted a nearby car for fingerprints; the prints were later matched to defendant.

At about 10:00 a.m., officers took Ramirez to a medical facility, where forensic nurse examiner Cynthia Urena examined her.  Urena observed an abrasion on Ramirez's vaginal vestibule and a bruise to the hymen; both injuries were caused by force, pressure, and movement.  Ramirez also had two lacerations in her perianal folds, both of which were caused by blunt force.

Urena collected swabs from Ramirez's face, mouth, neck, vagina, cervix, perianal area, and rectum. DNA extracted from the semen found in Ramirez's vagina matched defendant's DNA.

## CONTENTIONS

Defendant contends there is insufficient evidence to support his sodomy conviction because the prosecution failed to establish the "element of anal penetration by a penis" beyond a reasonable doubt. He also argues he received ineffective assistance of trial counsel because counsel failed to object to testimony about out-of-court surveillance footage, failed to ask the court to instruct with CALCRIM No. 333 about lay opinion testimony, and failed to object to the prosecution's use of the term *rape kit*. Finally, he contends that the court had a sua sponte obligation to instruct the jury that it must abide by the interpreter's translation of Ramirez's testimony, and that his sentence is unauthorized because the court failed to state its reasons for imposing upper terms for two enhancements and lacked discretion to impose consecutive one-strike terms.

## DISCUSSION

### 1. There was sufficient evidence of penetration to support count 5.

Defendant contends there is insufficient evidence of anal penetration to support his conviction for sodomy by force (§ 286, subd. (c)(2)(A); count 5). He argues Ramirez "never testified that [defendant] put his penis inside her anus or rectum," and though there was evidence of trauma to Ramirez's perianal area, there was no injury to the anus itself. The People argue Ramirez's testimony that defendant "started having anal sex with" her is

6

sufficient to satisfy the disputed element. As a matter of first impression, we conclude penetration beyond the buttocks and into the perianal folds is sufficient to establish the requisite penetration—namely, sexual penetration of the anal opening. Taken together, Ramirez's testimony and the injuries to the perianal folds were sufficient to support the verdict.

### 1.1. Elements of sodomy

A criminal defendant may not be convicted of a crime unless the prosecution proves every fact necessary for conviction beyond a reasonable doubt. (U.S. Const., 5th Amend.; U.S. Const., 14th Amend.; see Cal. Const., art. I, §§ 7, 15; *In re Winship* (1970) 397 U.S. 358, 364; *Jackson v. Virginia* (1979) 443 U.S. 307, 316.) This constitutional principle is so fundamental to our system of justice that criminal defendants are always "afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts." (*United States v. Powell* (1984) 469 U.S. 57, 67.)

To convict a defendant of forcible sodomy (§ 286, subd. (c)(2)(A)), the People must prove:

- the defendant committed an act of sodomy with another person;

- the other person did not consent to the act; and

- the defendant accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the victim or another person.

(§ 286, subd. (c)(2)(A).) Sodomy, in turn, "is sexual conduct consisting of contact between the penis of one person and the anus of another person. Any *sexual penetration*, however slight, is sufficient to complete the crime of sodomy." (§ 286, subd. (a), emphasis added.) Before we can determine whether there is sufficient evidence of sexual penetration, however, we must define that term.

### 1.2. Sexual penetration

At common law, *any* act of sodomy was criminal. (4 Blackstone, Commentaries 215–216.) When California codified the common law, the new Penal Code contained the same blanket prohibition. Section 286 provided, "Every person who is guilty of the infamous crime against nature, committed with mankind or with any animal, is punishable by imprisonment … ." (§ 286, as enacted by Pen. Code of 1872.) The codifiers also enacted a companion statute, section 287, which provided, "Any sexual penetration, however slight, is sufficient to complete the crime against nature." (§ 287, as enacted by Pen. Code of 1872; see *People v. Martinez* (1986) 188 Cal.App.3d 19 [discussing history of sodomy statute and penetration requirement].) In this regard, section 287 mirrored section 263, which provided that in cases of rape, "Any sexual penetration, however slight, is sufficient to complete the crime." (§ 263, as enacted by Pen. Code of 1872.)[4]

---

[4] Some scholars have argued that the focus on penetration legally encodes a male perspective on women and links current sexual violations to historical concepts of male property. (See Langston, *No Penetration—And It's Still Rape* (1998) 26 Pepperdine L. Rev. 1, 3–4, 10, 13–15; see also MacKinnon, *Sex and Violence: A Perspective* in Feminism Unmodified (1987) pp. 85–92 [emphasis on penetration defines rape from a male sexual perspective].) Such concerns led some

8

The Legislature did not decriminalize sodomy until 1975, when it limited section 286 to three specified circumstances. (Stats. 1975, ch. 71, § 7, p. 133.)  At the same time, it amended section 287 to refer to "sodomy" rather than "the crime against nature." (Stats. 1975, ch. 71, § 9, p. 134.)  Although section 287 was subsequently consolidated into section 286 (Stats. 1991, ch. 144, § 2, p. 1353), the Legislature has not made any other change to the text.

Despite these amendments, section 286 still does not define sexual penetration—but section 289 does.  Section 289 provides: " 'Sexual penetration' is the act of causing the penetration, however slight, of the genital or *anal opening* of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object." (§ 289, subd. (k)(1), emphasis added.)

Section 289, penetration by object, was enacted in 1978 to correct the disparate treatment accorded different forms of nonconsensual vaginal and anal penetration.[5]  (Stats. 1978,

states to deemphasize or redefine the penetration requirement when they amended their rape statutes in the 1970s and 1980s.  California was not one of those states.  (See Shams, *Rape* (2002) 3 Geo. J. Gender & L. 609, 611–613.)

[5]     Section 287 provided an unusually detailed description of the prohibited conduct; most treatises tended to be more circumspect.  Blackstone, for example, spent seven pages of his Commentaries discussing various aspects of rape, but limited his discussion of sodomy to Latin maxims.  (See, e.g., 4 Blackstone, Commentaries 216 [" *peccatum illud horribile, inter christianos non nominadum* " (that horrible crime not to be named among Christians)].)  Nor did judges

ch. 1313, § 1, p. 4300; Health & Welf. Agency, Enrolled Bill Rep. on Sen. Bill No. 1640 (1977–1978 Reg. Sess.) Aug. 17, 1978, p. 1 (hereafter Enrolled Bill Rep.) ["The measure was introduced … to correct a deficiency in existing law."].) Until that point, a defendant who used his penis to penetrate a victim could be convicted of rape or sodomy—but a defendant who used an object to commit the same act could not. (*People v. Harrison* (1989) 48 Cal.3d 321, 327–328.)

Because section 289 was enacted to correct this problem—not to create a wholly novel offense—it shares "a very close relationship" with the rape and sodomy statutes. (*People v. Quintana* (2001) 89 Cal.App.4th 1362, 1369–1370; Enrolled Bill Rep., *supra*, p. 1 [bill "was substantially amended during the course of hearings so that its language parallels existing forcible sodomy and oral copulation statutes. … Its main benefit is to make more specific the elements which constitute this offense, thus allowing for more effective prosecution."]; Assem. Com. on Crim. J., Analysis of Sen. Bill. 1640 (1977–1978 Reg. Sess.) as amended Aug. 14, 1978, p. 2 ["The language of this bill currently parallels the language of the forcible sodomy and oral copulation statutes."].) In short, the Legislature did not intend to create a new standard; it simply made explicit what had theretofore been implicit.[6] (See *People v. Martinez, supra*, 188 Cal.App.3d at p. 25

---

think additional detail was necessary. (See, e.g., *People v. Williams* (1881) 59 Cal. 397, 398 ["Every person of ordinary intelligence understands what the crime against nature with a human being is."].)

[6] Indeed, the bill was originally drafted to redefine rape to include vaginal penetration by any part of the human body or any foreign object. (Sen. Com. on Jud., Analysis of Sen. Bill. 1640 (1977–1978 Reg. Sess.) as introduced, p. 1.)

["'when the Legislature enacts a law "framed in the identical language" of a previous law on the same subject, it is presumed that the new law has the same fundamental meaning as the old law.' [Citation.]"].)

As if to underscore that point, in 1986, the Legislature tried to bring additional consistency to the four "major sex offenses of rape, sodomy, oral copulation, and sexual penetration" by criminalizing the same conduct in each offense. (*People v. White* (2017) 2 Cal.5th 349, 358–359 (*White*); see *id.* at pp. 357–360 [discussing parallel construction of sex crime statutes]; see also Sen. Com. on Judiciary, Analysis of Assem. Bill No. 3485 (1985–1986 Reg. Sess.) as amended June 30, 1986, p. 2 ["This bill would conform the criteria used to determine the commission of each of the four major sex offenses"]; Sen. Com. on Rules, Analysis of Assem. Bill No. 3485 (1985–1986 Reg. Sess.) as amended Aug. 20, 1986, p. 5 [bill's "author believes that the 'circumstantial criteria used to determine the commission of each of the four major sex offenses …' should be consistent."].) Lawmakers hoped that by standardizing the substantive elements of each offense, they could "reduce the potential for dismissal of cases containing circumstances inadvertently omitted from the definition of the specific crime." (Sen. Com. on Rules, *supra*, at p. 2.)

In light of this intent, the California Supreme Court recently construed four sex offense statutes—rape (§ 261), oral copulation (§ 288a), sodomy (§ 286), and object penetration (§ 289)—as reflecting a consistent legislative scheme despite their different language. The Court explained: "*Substantively*, the provisions regarding the four major sex crimes parallel each other. The conduct and mental state of the perpetrator … that, when accompanying the acts …, transform these sexual acts into

11

crimes are essentially identical." (*White*, *supra*, 2 Cal.5th at p. 357.) Though *White* did not specifically hold that section 289 applies to the other offenses, the opinion compels that result. (See also *People v. Harrison*, *supra*, 48 Cal.3d at pp. 327–334 [discussing penetration requirements in rape and sodomy statutes, both of which "relate to the same subject matter— unlawful penetrations of the genitals and anus"]; *People v. Quintana*, *supra*, 89 Cal.App.4th at pp. 1369 ["It would be anomalous and confusing if … 'sexual penetration' in section 289 meant something other than 'sexual penetration' in section 263, where those words first appeared."], 1370 [section 289 "*is* a form of rape, and there is no reason to distinguish the degrees of penetration required to commit different forms of this same crime."]; *People v. Romanowski* (Mar. 27, 2017, S231405) __ Cal.5th __ [2017 Cal. Lexis 2326, *21–22] [definitional statute that "sets the ground rules for how theft crimes are adjudicated" applies to crimes "set out in a variety of other sections."].)

We therefore hold that the definition of sexual penetration in section 289 applies equally to the sexual penetration element of section 286.[7] Section 289 defines sexual penetration, in relevant part, as "the act of causing the penetration, however slight, of the … anal opening." (§ 289, subd. (k)(1).) Thus, the question before us is whether there is sufficient evidence that defendant's penis penetrated Ramirez's anal opening.[8]

---

[7] We express no opinion on whether section 289's intent requirement also applies to section 286.

[8] We note that CALCRIM No. 1030, the pattern jury instruction given in this case, defines sodomy as "any penetration, no matter how slight, of the anus of one person by the penis of another person." It does not address the *sexual penetration* element of the sodomy statute

12

### 1.3. Anal opening

Defendant contends he touched—but did not penetrate—Ramirez's anal opening.[9]  But the distinction between touching and penetration depends on the meaning of *anal opening*—and contrary to defendant's implication, that term is not synonymous with *anus*, either anatomically or legally.  For the reasons discussed below, we conclude forcible sodomy requires something more than penetration of the buttocks (see *State v. A.M.* (Wash.Ct.App. 2011) 163 Wash.App. 414 [penetration of buttocks not sufficient]; *State v. Wells* (Ohio 2001) 740 N.E.2d 1097 [same]), but does not require penetration past the anal verge or into the anal canal.

### 1.3.1. Plain meaning

Unlike *sexual penetration*, the Penal Code does not define *anal opening*.  The term's meaning, therefore, is a "question[] of statutory interpretation that we must consider de novo." (*People v. Prunty* (2015) 62 Cal.4th 59, 71.)  As with any case involving statutory interpretation, our primary goal is to ascertain and effectuate the lawmakers' intent.  (*People v. Park* (2013) 56 Cal.4th 782, 796.)  To determine intent, we first examine the statutory language and give the words their ordinary meaning.  (*Ibid*.)  "Words and phrases must be construed according to the context and the approved usage of the language; but technical

---

(§ 286).  As neither party challenges this instruction, we do not address it.  Nevertheless, we invite the Advisory Committee on Criminal Jury Instructions to consider revisions to CALCRIM No. 1030.

[9]  Defendant also argues there is insufficient evidence that he used his penis to effect the penetration; we address that issue separately.

words and phrases, and such others as may have acquired a peculiar and appropriate meaning in law, must be construed according to such peculiar and appropriate meaning." (§ 7, subd. (16); see *People v. Gonzales* (Mar. 23, 2017) __ Cal.5th __ [2017 Cal. Lexis 2091, *19–20 & fn. 12] [because term of art "must be understood as it is defined, not in its colloquial sense," courts must assume the Legislature knew the ramifications of its word choices].)

If statutory language is unambiguous, its plain meaning controls; if the statutory language is ambiguous, " ' "we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history." [Citation.] Ultimately we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute. [Citations.]' " (*Mays v. City of Los Angeles* (2008) 43 Cal.4th 313, 321.) We begin by examining the term's plain meaning.[10]

---

[10] While courts can sometimes glean a term's meaning by resorting to the dictionary, dictionaries are of limited use here. *Anal opening* appears to be a legislative invention, and as such, has not been defined by lexicographers. As for the term's constituent parts, the Oxford English Dictionary, for example, defines *anal* as "the excretory opening of the digestive tract" ("anal, *adj*." OED Online. Oxford University Press. <http://www.oed.com/view/Entry/6994?redirectedFrom= anal#eid> [as of April 10, 2017]); it defines *opening* as an "aperture in the body; a bodily orifice" ("opening, *n*." OED Online. Oxford University Press. <http://www.oed.com/view/Entry/131716? rskey=j3EqQ8&result=1#eid> [as of April 10, 2017]). While these definitions provide a general location, they do not tell us where the opening begins and ends, and do not help us ascertain what, exactly, needs to be penetrated.

The anus contains two sections—a mucosa-lined anal canal at the top and an epidermis-lined perianal margin at the bottom. (Internat. Agency for Research on Cancer, World Health Organization Classification of Tumours. Pathology and Genetics of Tumours of the Digestive System (Aaltonen & Hamilton edits., 2000) Tumours of the Anal Canal, p. 147 (hereafter IARC).)  At the top, the rectum connects the large intestine to the anal canal. (Taber's Cyclopedic Medical Dictionary (16th ed.1989) p. 1570.)  At the bottom, the anal verge connects the end of the anal canal to the anal margin.  (Mills (3d ed. 2007) Histology for Pathologists, ch. 27, p. 664 (hereafter Mills) ["The anal verge can be defined as the point (line) where the walls of the anal canal come in contact in their normal resting state."]; Cal. Off. of Emergency Services, Cal. Medical Protocol for Examination of Sexual Assault and Child Sexual Abuse Victims (2001) appen. N (hereafter OES, Medical Protocol) [defining *anal verge* as "the tissue overlying the subcutaneous external anal sphincter at the most distal portion of the anal canal (anoderm) and extends exteriorly to the margin of the anal skin."].)

"The anal margin begins approximately at the anal verge … .  It represents the transition from the squamous mucosa to the epidermis-lined perianal skin, and extends to the perianal skin."  (Ryan & Willett (2011) Classification and Epidemiology of Anal Cancer, figure 1.)  The outer "boundary [of the anal margin] is indistinct …, and anatomically;" its location varies by person. (American Joint Committee on Cancer (6th ed. 2002) Staging Manual, ch. 13, p. 125.)

"The perianal skin (the anal margin) is defined by the appearance of skin appendages."  (IRAC, *supra*, at p. 147; see Mills, *supra*, at p. 670 ["At the lower border of the anal canal, the

dull, wrinkled perianal skin with hair follicles is obvious"].) However, the "perianal region is not well defined" (Mills, *supra*, at p. 667), and "[t]here exists no generally accepted definition of its outer limit." (IRAC, *supra*, at p. 147; see OES, Medical Protocol, *supra*, at appen. M, p. 27 [defining *perianal skin folds* as "[w]rinkles or folds of the perianal skin radiating from the anus, which are created by the contraction of the external anal sphincter."].) Indeed, "much confusion continues about definitions and nomenclature" of these structures generally. (Mills, *supra*, p. 664; see, e.g., *id.* at p. 665 ["It would seem natural to start with a definition of the anal canal; but, because there are several definitions and new terms are still introduced, a description of the anatomical landmarks and epithelial zones may be the best introduction to this never-ending discussion."]; Rociu et. al, *Normal Anal Sphincter Anatomy* (2000) 217 Radiology 395–401, 399 ["There have been many contradictory and often confusing theories of the anatomy of this region."].) It appears, therefore, that the terms anal verge, anal margin*,* perianal area, perianal folds, and perianal skin all describe at least part of the anal opening—the outer boundary of the anus.

Given that medical professionals cannot agree on what to call the areas between the rectum and the buttocks, it is not surprising that the courts—which until recently referred to sodomy in wholly euphemistic terms—have struggled as well. (See, e.g., *People v. Gann* (1968) 259 Cal.App.2d 706, 710 ["On account of the degrading nature of the crime of sodomy it is uniformly held that it is not necessary to describe the offense with the same particularity which is required in other crimes."], 712 ["the commonly understood meaning of the euphemism, 'infamous crime against nature,' in section 286 of the Penal Code,

16

is sufficiently definite to apprise the public generally of the conduct which is prohibited thereby, *sic*, copulation per anum"].)

In light of this terminological confusion, we conclude that *anal opening* lacks a sufficiently plain meaning to end our inquiry.  We therefore turn to other forms of statutory interpretation.

### 1.3.2.   Construction with related statutes

While we look first at the words of a statute, we do not consider statutory language in isolation; rather, we read the statute "as a whole, harmonizing the various elements by considering each clause and section in the context of the overall statutory framework."  (*People v. Jenkins* (1995) 10 Cal.4th 234, 246.)  We construe all parts of a statute together, without according undue importance to a single or isolated portion.  (*Cooley v. Superior Court* (2002) 29 Cal.4th 228.)  Where statutes are inconsistent, we attempt to provide a harmonious interpretation and give effect to every provision, so that one code section does not destroy another.  (*People v. Jenkins*, *supra*, at p. 246; see 2A Sutherland Statutory Construction (7th ed., rev. Apr. 2014) § 46:6, pp. 238–252.)  Thus, a " 'word or phrase will be given the same meaning each time it appears in a statute … .' "  (*Cooley v. Superior Court*, *supra*, at p. 255.)

As discussed, the Penal Code defines sodomy as "sexual conduct consisting of contact between the penis of one person and the anus of another person.  Any sexual penetration, however slight, is sufficient to complete the crime of sodomy."  (§ 286, subd. (a).)  *Sexual penetration*, in turn, is penetration of the anal opening.  (§ 289, subd. (k)(1).)  Taken together, the crime of sodomy requires the perpetrator to penetrate the anal opening *and* to make contact with the anus.  To give effect to both

17

requirements, the anus must lie somewhere beyond the anal opening.[11]

Moreover, such a construction avoids surplusage and harmonizes the *sexual penetration* element of sodomy and object penetration with the anal contact element of sodomy and oral copulation.  (See *White, supra,* 2 Cal.5th at p. 357 [substantive elements of rape, sodomy, oral copulation, and object penetration are the same].)  "Oral copulation is the act of copulating the mouth of one person with the sexual organ or anus of another person."  (§ 288a, subd. (a).)  " '[A]ny contact, however slight, between the mouth of one person and the sexual organ or anus of another person constitutes oral copulation.' "  (*People v. Dement* (2011) 53 Cal.4th 1, 41–42, abrogated on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)  Thus, contact with the anus does not require penetration.  (*Id.* at pp. 41–44.)

This construction also harmonizes the elements of sodomy, object penetration, and oral copulation with the *sexual intercourse* element of rape.  (§ 261, subd. (a) [defining rape as nonconsensual "sexual intercourse."].)  While section 263 provides that sexual intercourse requires penetration, the Penal Code does

---

[11]    The presence of **both** requirements differentiates California's sodomy statute from laws in other states that refer to *either* penetration of the anal opening *or* contact with the anus, but not both. (See, e.g., *Watkins v. State* (Fla.Ct.App. 2010) 48 So.3d 883, 884 [evidence the victim placed her tongue "on" the defendant's anus was insufficient to establish slight penetration of the anus]; *Richards v. State* (Fla.Ct.App. 1999) 738 So.2d 415, 418 [in statute phrased in the alternative, "union" requires "contact with the relevant portion of anatomy, whereas penetration requires some entry into the relevant part, however slight."]; *State v. Gallagher* (N.J.Sup.Ct.App. 1995) 668 A.2d 55, 61 ["anal intercourse" requires insertion "into the anus"; touching insufficient].)

not specify what has to be penetrated for sexual intercourse to occur. The Supreme Court has described the requirement as "vaginal penetration," but has never held that section 261 requires vaginal penetration as it is commonly understood. (*People v. Stitely* (2005) 35 Cal.4th 514, 554–555.)

That point bears emphasis because notwithstanding the term's apparently plain meaning, appellate courts have long held that vaginal penetration does *not* require penetration of the vagina. (*People v. Karsai* (1982) 131 Cal.App.3d 224, 232 (*Karsai*).) Rather, "[p]enetration of the external genital organs is sufficient to constitute sexual penetration and to complete the crime of rape even if the rapist does not thereafter succeed in penetrating into the vagina." (*Ibid.* [victim's testimony that defendant pushed his penis between the "lips" of her vagina was sufficient to support rape conviction]; see also *People v. Dunn* (2012) 205 Cal.App.4th 1086, 1097 [relying on *Karsai*, sexual intercourse required proof of "penetration of [the victim's] labia majora, not her vagina"].) In short, although the term *vagina* has a well-established anatomical meaning, California courts have long treated it as a term of art synonymous with "female private parts." (See, e.g., *People v. Coleman* (1942) 53 Cal.App.2d 18, 26 [sufficient evidence defendant used his "private parts" to penetrate victim's "private parts"].)[12]

---

[12] *Karsai* was disapproved on other grounds in *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8, but remains good law on this point. Fifteen years after *Karsai* held that the "penetration which is required is sexual penetration and not vaginal penetration[]" (*Karsai, supra,* 131 Cal.App.3d at p. 232), the California Supreme Court began referring to rape's sexual intercourse element as "vaginal penetration." (*People v. Holt* (1997) 15 Cal.4th 619, 675–676.) While that language casts some doubt on *Karsai*'s continued validity, the Court has never

The "essential guilt" of both rape and forcible sodomy "consists in the outrage to the person and feelings of the victim." (§ 263.) Consequently, courts are inclined to take a broad view of genital boundaries. As noted above, it appears the perianal folds, which radiate from the anus, comprise the outer boundary of the anus (OES, Medical Protocol, *supra*, at appen. M, p. 27); thus, the outer edge of the perianal area forms the edge of the anal opening. Even if the perianal area merely *adjoins* the anal opening, however, statutory consistency—particularly among the "four major sex crimes"—compels the same conclusion. (See *White*, *supra*, 2 Cal.5th at p. 359 [statutes "for which the concept of penetration is relevant contain similar provisions regarding the extent of the required penetration [citations]."].) The perianal area it is undoubtedly part of the external anal structure—just as the labia, though not part of the vagina, are undoubtedly part of the external female genitalia. Both areas are part of a victim's "private parts." We see no reason to adopt different penetration rules for the anus and the vagina.[13]

We therefore hold that sexual penetration requires penetration of the tissues that surround and encompass the lower

explained what it means by this term, and appellate courts continue to rely on *Karsai*.

[13] We are mindful that while California courts only require penetration of the external genitalia, other states require additional penetration. For example, when construing *anal cavity*, the Ohio Supreme Court concluded that *cavity* refers to a space inside the body, and that *anal cavity* refers to the lower portion of the alimentary canal. Thus, Ohio law required penetration of an *inner* genital structure. (*State v. Wells*, *supra*, 740 N.E.2d at p. 1099.) Since California law, unlike Ohio law, does not require penetration of the anal cavity, our statute does not carry the same connotation.

border of the anal canal—that is, it requires penetration past the buttocks and into the perianal area but does not require penetration beyond the perianal folds or anal margin.

We emphasize, however, that mere penetration of the buttocks is **not** sufficient to establish penetration of the anal opening. "An intrusion into the space between a person's buttocks, while perhaps a necessary step on the path to intrusion of the anal opening, is not, in itself, an intrusion into the anal opening." (*In re B.H.* (R.I. 2016) 138 A.3d 774, 782, & fn. 9 [citing cases]; see *Downey v. State* (Ind.Ct.App. 2000) 726 N.E.2d 794, 797 ["Despite their proximity, the buttocks and anus are not the same, and an inference that contact with the buttocks necessarily includes contact with the anus cannot be made beyond a reasonable doubt" absent other evidence].)

In all sex-crime cases requiring penetration, prosecutors must elicit precise and specific testimony to prove the required penetration beyond a reasonable doubt. (See, e.g., *State v. Pullman* (Utah Ct.App. 2013) 306 P.3d 827, 833 ["Sex crimes are defined with great specificity and require concomitant specificity of proof."].) We caution prosecutors not to use vague, euphemistic language and to ask follow-up questions where necessary.[14]

---

[14] For example, the prosecutor in this case asked the forensic nurse examiner about injuries to Ramirez's "anal area" and "vaginal area," injuries he encouraged the nurse to describe "in laymen's terms." As we will discuss, the nurse's detailed, precise testimony—provided despite the prosecutor's efforts to limit her to generalities—was the critical evidence of penetration in this case.

### 1.4. There was sufficient evidence defendant penetrated Ramirez's anal opening with his penis.

Having determined the type of sexual penetration section 286 requires, we turn to the question before us—is the evidence sufficient to support the verdict?

In assessing the sufficiency of the evidence, we review the entire record to determine whether *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Ibid.*)

In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) The same standard applies where the conviction rests primarily on circumstantial evidence. (*People v. Thompson* (2010) 49 Cal.4th 79, 113.) We may not reweigh the evidence or resolve evidentiary conflicts. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Accordingly, we may not reverse for insufficient evidence unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Ramirez testified as follows:

Q. And did part of his body touch you?

A. Yes.

Q. What part of his body?

A. His penis.

Q. What part of your body did he touch with his penis?

A. Behind me.

Q. Okay. When you say behind you, are you referencing a specific part of your body?

A. Yes. He started having anal sex with me.

The prosecutor also asked Ramirez, "Was he moving his body in and out of yours?" She responded, "Yes." Ramirez explained that the act caused her pain. Urena, the forensic nurse examiner, testified that she discovered two tears or lacerations located across from each other in Ramirez's perianal folds. The injuries were caused by some sort of blunt force.

In *People v. Gonzalez*, the court found that the victim's testimony that the defendant "tried to enter a little bit, but it hurt a lot" supported a finding of slight penetration, which when combined with circumstantial evidence of rectal pain and bleeding, was sufficient to sustain the sodomy conviction. (*People v. Gonzalez* (1983) 141 Cal.App.3d 786, 790.) Here, we conclude the blunt-force injuries to the top and bottom of Ramirez's perianal folds, when combined with her testimony that defendant "started having anal sex" with her and her agreement that he moved "his body in and out" of hers, were sufficient to prove the slight penetration required under section 286.

Defendant argues in the alternative that Ramirez's "testimony at best established only the possibility of penile penetration, with digital penetration being just as likely, since [defendant] was behind [Ramirez]. There was no testimony that

[Ramirez] saw [defendant's] penis, or saw [his] penis penetrate her anus." Thus, defendant speculates, Ramirez's pain—and, presumably, the injuries to the perianal folds—may have been caused by something other than defendant's penis.

Defendant misunderstands the relevant standard of review. " 'Substantial evidence' " is a " 'deferential' standard." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.) As we have explained, the "inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question. Once such evidence is found, the substantial evidence test is satisfied. [Citation.] Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding." (*Ibid.*)

Ramirez testified that defendant touched her body "behind" with his penis, that this meant he "started having anal sex" with her, that he moved his body in and out of her body, and that it caused her pain. The jury could reasonably infer from this testimony that Ramirez believed that defendant penetrated her with his penis rather than with anything else; absent an objection, the jury was entitled to credit that opinion.[15]

We conclude the evidence was sufficient to support defendant's conviction for count 5.

## 2. Ineffective assistance of counsel

"The Sixth Amendment secures to a defendant who faces incarceration the right to counsel at all 'critical stages' of the

---

[15] For example, the defense did not object that this testimony was an improper subject of lay opinion testimony. (See Evid. Code, § 800.)

criminal process. [Citations.]" (*Iowa v. Tovar* (2004) 541 U.S. 77, 87; see *People v. Doolin* (2009) 45 Cal.4th 390, 417 ["A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution."].) Defendant contends he was denied constitutionally adequate representation when his attorney (1) failed to object to brief testimony about a grainy surveillance video that was not admitted into evidence, (2) failed to ask the court to instruct the jury with CALCRIM No. 333 regarding lay opinion testimony, and (3) failed to object to the use of the term *rape kit*.

Under either the federal or state constitution, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*).) To establish ineffective assistance, defendant must satisfy two requirements. (*Id.* at pp. 690–692.) First, he must show his attorney's conduct was unreasonable "under prevailing professional norms"—that is, that it fell "outside the wide range of professionally competent assistance." (*Id.* at pp. 688, 690.) This requires him to establish "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Id.* at p. 687.)

Then, the defendant must demonstrate that the deficient performance was prejudicial—i.e., there is a reasonable probability that but for counsel's failings, the result of the proceeding would have been different. (*Strickland*, *supra*, 466 U.S. at pp. 687 [defendant must show "counsel's errors were so

25

serious as to deprive the defendant of a fair trial, a trial whose result is reliable."], 694.) "It is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the result would have been different." (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.)

"Unless a defendant makes both showings, it cannot be said that the conviction … resulted from a breakdown in the adversary process that renders the result unreliable." (*Strickland*, *supra*, 466 U.S. at p. 687.) Accordingly, we "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Id.* at p. 697.)

The California Supreme Court has held that the *Watson* "reasonable probability" standard for state law error is identical to the similarly-phrased prejudice prong for ineffective assistance under *Strickland*. (*People v. Watson* (1956) 46 Cal.2d 818 (*Watson*); *Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1058–1059.) Under *Watson*, we may reverse only where a defendant can establish "that it is reasonably probable that a result more favorable to [him] would have been reached in the absence of the error." (*Watson*, *supra*, at p. 836.) A reasonable probability "does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*. [Citations.]" (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) An error is prejudicial whenever the defendant can " 'undermine confidence' " in the result achieved at trial. (*Ibid.*)

Defendant has not established that any errors were prejudicial. Accordingly, we find no constitutional violation.

### 2.1. Failure to object to the surveillance video

Detective Marjan Mobasser testified that in the course of the investigation, she viewed surveillance footage from a business adjacent to the crime scene; the video was not admitted into evidence, but Mobasser explained what she saw. The footage showed two people from behind. Based on their height and weight, one person appeared to be male, but the video was so grainy, Mobasser could not identify either person. The time stamp on the video corresponded to the abduction timeline Ramirez had provided. Mobasser's testimony on this topic consumed four transcript pages—about 22 sentences. Defendant insists that trial counsel should have objected.[16]

Mobasser's testimony was brief, and the prosecutor did not rely on it in closing argument. And while the testimony tended to corroborate Ramirez's overall account, it did not link defendant to the crime. Mobasser made no attempt to identify anyone on the video. To the contrary, she testified that despite meeting

---

[16] Though he acknowledges evidentiary errors are not subject to appellate review absent an objection below (Evid. Code, § 353, subd. (a) [to preserve evidentiary error, party must make a timely objection in the trial court "so stated as to make clear the specific ground of the objection or motion."]; *People v. Partida* (2005) 37 Cal.4th 428, 433–434 [objection requirement gives court a concrete legal proposition to pass on, gives the offering party an opportunity to cure the defect, and prevents abuse]), and acknowledges that he did not object, defendant appears to argue the issue is cognizable on appeal because the admission of irrelevant testimony amounts to a non-waivable violation of due process. We disagree. The rules of evidence are not self-executing, and section 1044 did "not abolish or supersede the rules of trial objection or appellate waiver." (*People v. Arias* (1996) 13 Cal.4th 92, 159–160; *People v. Ponce* (1996) 44 Cal.App.4th 1380, 1386–1388 [section 1044 codifies court's inherent duty to control proceedings].)

Ramirez, she did not know whether Ramirez was one of the people she saw. That testimony was consistent with the defense theory of the case—that Ramirez was telling the truth about the attack, but defendant was not her attacker.

It was also consistent with defense counsel's trial strategy. In his opening statement, counsel explained that he would not ask questions about undisputed issues: "For example, there's not going to be any dispute that [Ramirez] was sexually assaulted. The defense is not contending that. This is not an issue of consent or any other situation like that. This issue is identity. Who is the person that sexually assaulted [Ramirez] on August 16th, 2012?"

In closing argument, counsel argued, "I'm not disputing that [Ramirez] was attacked. I'm not calling her a liar. I'm not trying to discredit her or suggest in any way that she solicited this to happen; that she had any part in this. But the clear issue in this case is identity." Counsel returned to that theme: "I didn't ask her about the details. I didn't ask the nurse about the details. I'm not disputing the details. I'm not disputing that she was hurt." Again: "nobody here, including myself, is disputing that she was attacked in an awful and brutal way."

In short, because Mobasser's testimony tended to corroborate that the assault occurred where and when Ramirez claimed—but did not corroborate the evidence defendant was the attacker—there is no reasonable probability that the result in this case would have been different if the testimony had been excluded.

### 2.2.    Failure to request CALCRIM No. 333

As discussed, Mobasser related what she saw on a video that was not played for the jury. Defendant does not object that

28

the opinion itself was improper; instead, he argues the evidence should have been excluded as irrelevant. Nevertheless, he asserts that counsel's failure to ask the court to instruct the jury about the proper method for evaluating that evidence was reversible error.[17]

"While *experts* can testify to opinions based on matters not admitted into evidence (Evid. Code, § 801), … an opinion by a nonexpert 'is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: (a) Rationally based on the perception of the witness … .' (Evid. Code, § 800.)" (*People v. Golde* (2008) 163 Cal.App.4th 101, 120.) For such an opinion to be admissible, evidence must be adduced as to the basis for the opinion, i.e., the perception that led the witness to that opinion. (Evid. Code, § 802; *Stuart v. Dotts* (1949) 89 Cal.App.2d 683, 686–687 ["Opinion evidence may be given from personal observation on subjects such as whether a party is intoxicated, but not on facts related by other parties."].)

CALCRIM No. 333 addresses this type of evidence. While the jury was not specifically instructed on lay opinion testimony, it was properly instructed on how to evaluate witness testimony in general—and CALCRIM No. 333 essentially instructs the jury to apply those rules by giving lay opinions whatever weight it thinks the opinions are worth.

As discussed, identity was the only issue in this case—and Mobasser's testimony did not relate to identity. The evidence

---

[17] Defendant appears to invite us to disregard the California Supreme Court's conclusion that trial courts do not have a sua sponte duty to instruct the jury about the uses of lay opinion testimony. (*People v. Boyce* (2014) 59 Cal.4th 672, 715.) We decline his invitation. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450.)

29

actually relating to identity was overwhelming, however. The fingerprints discovered at the scene and the DNA extracted from semen found in Ramirez's vagina both matched defendant. While defendant attacked the scientific evidence, the experts thoroughly described their scientific process, the methods they used to ensure accurate results, and their lack of bias in conducting testing. Nor did defendant present any experts who reached contrary conclusions. Instead, the fingerprint and DNA results corroborated each other. We therefore conclude there is no reasonable probability that the result in this case would have been different if the jury had been instructed with CALCRIM No. 333.

### 2.3. Failure to object to the term *rape kit*

Defendant argues that his trial lawyer provided constitutionally inadequate assistance by failing to object to the use of the term *rape kit* because rape is an inflammatory word.[18] The term *rape kit* was used about a dozen times at trial.[19] Witnesses and counsel also described the kit as a "sexual assault

---

[18] Defendant implicitly acknowledges that his failure to object below forfeited this argument. (See, e.g., *People v. Valenti* (2016) 243 Cal.App.4th 1140*,* 1172 ["If defendant wished to be called by some other term, the proper procedure was to bring a motion in limine. (See, e.g., Giarrusso, The General and Captain Justice (2014) 61 La. B.J. 392 [suggesting 'Citizen Accused' and 'that innocent man' as alternatives to 'defendant'].)"].)

[19] The prosecutor mentioned a "rape kit" seven times in his opening statement on April 23, 2015. The term was also used four times during trial testimony that day. The term was used twice on April 24, 2015, and was not used at all April 27, 2015. We also note that appellate counsel uses the term "rape kit" in the statement of facts.

kit," "evidence kit," and "kit." The alternative terms were used almost twice as often as "rape kit."

Defendant argues persuasively that repeated use of the term *rape kit* can act to undermine the presumption of innocence in a generic criminal case, that the term is used out of habit, and that attorneys and witnesses should call the kit something else. He does not explain, however, why the use of *rape kit* was prejudicial in *this* case. As the defense bears the burden of establishing ineffective assistance of counsel, we find no Sixth Amendment violation.

### 3. Failure to instruct on abiding by the interpreter's translation

Defendant contends that the trial court's failure to instruct the jurors that they must abide by the Spanish interpreter's translation rendered his trial fundamentally unfair and violated his federal due process rights. (See CALCRIM No. 121.) The court's sua sponte obligation to give such an instruction is an apparent issue of first impression in California. While giving the instruction is certainly the better practice whenever witness testimony is translated for the jury—and may well be required in cases like this one, where nuance and detail are critical—we need not resolve that question because any error was harmless beyond a reasonable doubt.

"We assess federal constitutional errors under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). Under *Chapman*, we must reverse unless the People 'prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' (*Ibid.*)" (*Valenti*, *supra*, 243 Cal.App.4th at pp. 1165–1166.) The People have met that burden.

31

There is simply no evidence in the voir dire transcripts—or any other part of the record in this case—that any juror understood Spanish. Nor does defendant indicate what testimony he believes was translated incorrectly. (See *People v. Boyce*, *supra*, 59 Cal.4th at p. 715 [any error in failing to instruct jury sua sponte not to converse with others or conduct independent investigation was harmless because there was "no evidence that any juror discussed the case with others or conducted any investigation," leaving no reasonable possibility the instruction's omission affected the verdict].) "In the absence of some specific indication of prejudice arising from the record, defendant 'does no more than speculate' [citation] that the absence of the instructions prejudiced him." (*People v. Lewis* (2008) 43 Cal.4th 415, 535, disapproved in part on other grounds by *People v. Black* (2014) 58 Cal.4th 912, 919–920.)

4.   **The court properly imposed consecutive sentences for counts 4 and 5.**

Defendant contends the court was not required to impose consecutive sentences for his rape (§ 261, subd. (a)(2); count 4) and sodomy (§ 286, subd. (c)(2)(a); count 5) convictions, and that it lacked the discretion to do so. The People argue consecutive sentencing was proper because the crimes occurred on separate occasions (§ 667.61, subds. (a), (d)(2), (i); § 667.6, subd. (d)), and in any event, the court had the discretion to impose consecutive terms and affirmatively stated that if the decision were left to its discretion, it would impose consecutive terms. We conclude the court properly exercised its discretion.

### 4.1. One Strike Law

Under certain circumstances, the One Strike Law (§ 667.61) requires courts to impose longer sentences on defendants who commit violent sex crimes like rape (§ 261; count 4) and forcible sodomy (§ 286, subd. (c)(2)(A); count 5). (§ 667.61, subd. (c).) As relevant to this case, when a defendant is convicted of a sex offense listed in subdivision (c) *and* either one aggravating factor listed in subdivision (d) or two aggravating factors listed in subdivision (e), subdivision (a) requires the court to sentence him to an indeterminate term of 25 years to life. (§ 667.61, subds. (a), (c), (d).) Because the jury in this case found the kidnapping (§ 667.61, subd. (e)(1)), deadly-weapon (§ 667.61, subd. (e)(3)), and aggravated-kidnapping (§ 667.61, subd. (d)(2)) allegations true for counts 4 and 5, the court was required to sentence defendant to an indeterminate one-strike term for each count. (*People v. Rodriguez* (2012) 207 Cal.App.4th 204, 213 (*Rodriguez*).)

Once it determines the law applies, the trial court must decide whether to impose concurrent or consecutive one-strike sentences. While that choice is sometimes discretionary, the court *must* impose consecutive sentences "if the crimes involve separate victims or involve the same victim on separate occasions as defined in subdivision (d) of Section 667.6." (§ 667.61, subd. (i).) "In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a *reasonable opportunity to reflect* upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or

her opportunity to attack, shall be, in and of itself, determinative of the issue of whether the crimes in question occurred on separate occasions." (§ 667.6, subd. (d), emphasis added.)

The parties agree on this much—but they disagree on whether the offenses here were committed on separate occasions—and therefore, whether the court was required to sentence defendant to consecutive indeterminate terms. We need not reach that issue, however, because even were we to agree with defendant that the offenses were committed on the same occasion, and therefore, were not subject to *mandatory* consecutive sentencing under section 667.61, subdivision (i) (hereafter section 667.61(i)), defendant has not demonstrated that the court lacked the discretion to sentence him consecutively under section 667.6, subdivision (c) (hereafter section 667.6(c)).

### 4.2. The court had the discretion to impose consecutive sentences.

Under the One Strike Law, when a defendant commits multiple crimes against the same victim on the same occasion, the sentencing court has a choice. It can sentence the defendant to concurrent one-strike terms under section 1170.1. (§ 667.6(c).) Or, it may impose "a full, separate, and consecutive" one-strike term for each offense enumerated in subdivision (e)—including forcible rape (§ 261, subd. (a)(2); count 4) and sodomy by force (§ 286, subd. (c)(2)(a); count 5). (§ 667.6, subds. (c), (e)(1), (e)(4); *People v. Valdez* (2011) 193 Cal.App.4th 1515, 1524; see *Valenti, supra*, 243 Cal.App.4th at pp. 1178–1179.)

As defendant concedes, the court below imposed consecutive sentences as an exercise of its discretion. The court explained, "there is no doubt in my mind the defendant deserves consecutive sentencing on this case. … I believe that if it was

34

truly in my discretion it would be—I would sentence him consecutively."

Defendant insists, however, that if the court was not *required* to sentence him to consecutive terms under section 667.61, any consecutive "sentence would be unauthorized, warranting reversal." While his brief is not entirely clear on this point, defendant appears to argue that the court had no discretion to impose consecutive sentences, because although section 667.6, subdivision (d) applies to one-strike sentences, subdivision (c) does not.[20]

Defendant cites no authority to support this view, however. To be sure, defendant correctly notes that the cases cited by the prosecutor below do not hold that subdivision (c) applies to the One Strike Law—but those cases also do not stand for the opposite proposition that subdivision (c) does *not* apply. Because he did not file a reply brief in this case, defendant also fails to respond to the People's argument on that point or to the cases cited in the opposition brief.

We therefore conclude defendant was properly sentenced to consecutive one-strike terms for counts 4 and 5.[21]

---

[20] For example, defendant argues that "the record supports a conclusion the trial court imposed the sentences consecutively based not on the mandatory provisions of section 667.61, subdivision (i), but instead on the discretionary language of section 667.6, subdivision (c). … As proceeding in that manner was not authorized by section 667.61, the sentence would be unauthorized, warranting reversal." He does not explain why section 667.6, subdivision (c) should not apply to one-strike sentences, however.

[21] We note that the court based the one-strike sentences on triggering circumstances from *both* subdivision (d) and subdivision (e). Basing the sentence on subdivision (e) precluded the court from also imposing the section 12022.3 enhancements, however, because they

## 5. The court's failure to state reasons for imposing the high term for the weapon enhancements was harmless.

Defendant argues we must remand for resentencing because the court failed to state its reasons for selecting the high term for the weapon enhancements to counts 4 and 5, and he lacked a meaningful opportunity to object. Though we agree the court erred by failing to provide a reason for imposing the upper terms, in view of defendant's increasingly serious criminal history, prior prison sentences, and status as a probationer when he raped Ramirez, we find it is not reasonably probable that the result would have been different had the court been reminded to state its reasons. Accordingly, we conclude there is no basis for reversal.

---

were based on the same conduct as the triggering circumstance found true under subdivision (e)(3). (§ 667.61, subd. (f).) As the version of defendant's sentence imposed under subdivision (e) is unauthorized, but the alternative version imposed under subdivision (d) is not, and because there is no evidence from which we can infer the court may have exercised its discretion to dismiss the enhancements if given the chance, we modify the judgment to strike the portion imposing sentence under subdivision (e). (*People v. Valenti, supra,* 243 Cal.App.4th at p. 1173 ["We may correct an unauthorized sentence on appeal despite failure to object below"]; *People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6 [unauthorized sentence "subject to judicial correction whenever the error comes to the attention of the reviewing court."]; see *People v. Rivas* (2004) 119 Cal.App.4th 565, review den. Sept. 22, 2004 [court has discretion to strike enhancements based on conduct underlying extra one-strike circumstances, but not the circumstances themselves].) While defendant's actual term of imprisonment will not change, we modify the judgment to forestall later confusion on this point.

### 5.1. Relevant law

Although California's sentencing scheme for noncapital felonies "is vast, intricate, and frequently amended, its basic parameters have become familiar to courts and counsel over the years.

"In general, a defendant may be eligible for probation instead of imprisonment depending upon the nature of the offense. [Citations.] Where imprisonment is imposed, the court typically selects a lower, middle, or upper term as the base term for the underlying offense. [Citations.] An enhancement may be authorized or required depending on the circumstances of the crime [citation] and/or the history of the defendant [citation]. In cases involving multiple convictions, terms of imprisonment either can or must be made consecutive; in some cases, alternative formulas for consecutive sentences may be available. …

"Although many … provisions are mandatory, the trial court often has broad discretion to tailor the sentence to the particular case. The choices available commonly include the decision to order probation rather than imprisonment, to impose the lower or upper term instead of the middle term of imprisonment, to impose consecutive rather than concurrent sentences under certain discretionary provisions, and to strike or stay certain enhancements or waive a restitution fine. [Citation.] As directed by the Legislature, the Judicial Council has promulgated rules to guide these choices. [Citations.]

"The statutes and sentencing rules generally require the court to state 'reasons' for its discretionary choices on the record at the time of sentencing. (§§ 1170, subds. (b) & (c), 1170.1, subd. (h), 1202.4, subd. (a).) Such reasons must be supported by

a preponderance of the evidence in the record and must 'reasonably relat[e]' to the particular sentencing determination. [Citations.] No particular wording is required, but courts typically rely on applicable sentencing factors set forth in the statutory scheme and the rules. (See, e.g., §§ 1170.7–1170.85 [circumstances in aggravation]; rules 414 [criteria affecting probation], 421 [circumstances in aggravation], 423 [circumstances in mitigation], 425 [criteria affecting concurrent or consecutive sentences].)" (*Scott*, *supra*, 9 Cal.4th at pp. 349–350, alterations in *Scott*.)

"Against this backdrop, the purpose for requiring the court to orally announce its reasons at sentencing is clear. The requirement encourages the careful exercise of discretion and decreases the risk of error. In the event ambiguities, errors, or omissions appear in the court's reasoning, the parties can seek an immediate clarification or change. The statement of reasons also supplies the reviewing court with information needed to assess the merits of any sentencing claim and the prejudicial effect of any error. [Citations.]" (*Scott*, *supra*, 9 Cal.4th at p. 351.) For many of the same reasons, where the court fails to explain the reasons behind its decisions, a defendant's "lack of a timely and meaningful objection forfeits or waives the claim." (*Ibid.*)

There is a caveat to the forfeiture rule, however. The defendant must have a *meaningful opportunity* to object. (*Scott*, *supra*, 9 Cal.4th at p. 356.) "This opportunity can occur," *Scott* observed, "only if, during the course of the sentencing hearing itself and before objections are made, the parties are clearly apprised of the sentence the court intends to impose and the reasons that support any discretionary choices." (*Ibid.*)

38

As the Court later explained in *People v. Gonzalez*, the "*Scott* rule applies when the trial court 'clearly apprise[s]' the parties 'of the sentence the court intends to impose and the reasons that support any discretionary choices' (*Scott*, *supra*, 9 Cal.4th at p. 356), and gives the parties a chance to seek 'clarification or change' (*id*. at p. 351) by objecting to errors in the sentence. The parties are given an adequate opportunity to seek such clarifications or changes if, at *any time* during the sentencing hearing, the trial court describes the sentence it intends to impose and the reasons for the sentence, and the court thereafter considers the objections of the parties *before the actual sentencing*. The court need not expressly describe its proposed sentence as 'tentative' so long as it demonstrates a willingness to consider such objections. If the court, after listening to the parties' objections, concludes that its proposed sentence is legally sound, it may simply state that it is imposing the sentence it has just described, without reiterating the particulars of that sentence. By contrast, if the trial court finds that one of the parties has raised a meritorious objection to the proposed sentence, it should alter its sentence accordingly." (*People v. Gonzalez* (2003) 31 Cal.4th 745, 752, emphasis added.)

### 5.2. Defendant lacked a meaningful opportunity to object.

Section 12022.3, subdivision (a) provides for an enhancement of three, four, or 10 years for use of a deadly weapon in the commission of a sex offense. The choice of the appropriate term from three statutorily specified possibilities rests within the court's discretion. (§ 1170, subd. (b).) The court in this case imposed the upper term of 10 years for each enhancement, and was required to state the reasons for that

39

decision.  (§ 1170, subd. (c), [court "shall state the reasons for its sentence choice on the record at the time of sentencing."]; Cal. Rules of Court, rules 4.406(b)(4), 4.420(e).)  It failed to do so.

The People concede the court did not provide an indicated sentence in this case but argue defendant has forfeited this claim. They contend defendant had a meaningful opportunity despite the court's failure to provide an indicated sentence, because in "imposing consecutive terms on counts 4 and 5, the court noted the facts of *Jones*, then imposed the upper term on the weapon enhancements for both counts."  Then, after imposing sentence, defendant's "trial counsel engaged the court in a discussion about the facts of *Jones*."  The People have not cited any authority in support of the proposition that a post-sentence discussion about the facts of an unrelated case may indicate that defendant had a meaningful opportunity to object, and we find no such opportunity here.[22]

### 5.3.  The error was harmless.

"Where sentencing error involves the failure to state reasons for making a particular sentencing choice, including the imposition of consecutive terms," remand is not automatic. (*People v. Coelho* (2001) 89 Cal.App.4th 861, 889 [record revealed numerous aggravating circumstances and court did not explicitly find any mitigating circumstances].)  Reversal is required only if " 'it is reasonably probable that a result more favorable to the

---

[22]    The People's reliance on *People v. Gonzalez* is misplaced.  In that case, the Court found there was a reasonable opportunity to object where the defendant *actually objected* to the sentence after it was imposed.  (*People v. Gonzalez*, *supra*, 31 Cal.4th at p. 755.)  "The court did not tell defendants their objection was untimely or impermissible; instead, it considered and rejected the objection."  (*Ibid*.)

[defendant] would have been reached in the absence of the error.' " (*People v. Sanchez* (1994) 23 Cal.App.4th 1680, 1684, quoting *Watson*, *supra*, 46 Cal.2d at p. 836.)  Thus, "reviewing courts have consistently declined to remand cases where doing so would be an idle act that exalts form over substance because it is not reasonably probable the court would impose a different sentence." (*People v. Coelho*, *supra*, at p. 889; accord, *People v. DeHoyos* (2013) 57 Cal.4th 79, 155.)

Here, remand for a statement of reasons "would be no more than an idle act." (*People v. Williams* (1996) 46 Cal.App.4th 1767, 1782–1783.)  As defendant concedes, the court's statements demonstrate that it read the probation report and sentencing briefs and that it understood it had the discretion to impose any of the three terms available for the enhancements.  (Cf. *People v. Deloza* (1998) 18 Cal.4th 585, 600 [court misunderstood scope of discretion].)  The aggravating factors provided in the prosecution's sentencing brief—particularly the fact that defendant was on probation when he committed the crimes— support the sentence ultimately imposed.  Defendant offers no reason the court would change its mind upon remand.  Indeed, though the court struck the one-year prison priors (§ 667.5, subd. (b)) as an exercise of discretion, it emphasized that it was "choosing not to impose those 1-year priors based on the fact that I'm running counts 4 and 5 consecutive.  If I was running them concurrently I would impose that term."

Under these circumstances, it is not reasonably probable that defendant would receive a more favorable sentence were we to remand the matter.  (See *People v. Bravot* (1986) 183 Cal.App.3d 93, 98.)  Consequently, we decline to do so.

## DISPOSITION

The judgment is modified to vacate the portion of the sentence imposed under Penal Code section 667.61, subdivisions (a) and (e) and to clarify that sentence was imposed under subdivisions (a) and (d) only.  There is no change to the term of imprisonment.  As modified, the judgment is affirmed.

Upon issuance of the remittitur, the court is directed to correct the abstract of judgment (page 1, item 8) to reflect that defendant was sentenced under Penal Code section 667.61 and to send a corrected abstract of judgment to the Department of Corrections and Rehabilitation.


**CERTIFIED FOR PARTIAL PUBLICATION**


                                                                                LAVIN, J.

WE CONCUR:


ALDRICH, Acting P. J.


GOSWAMI, J.*

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.